**In re Scott James FORTIER, Debtor.**

**No. GG 99–07383.**

United States Bankruptcy Court, W.D. Michigan.

Sept. 18, 2003.

Michael L. Shiparski, Esq., Assistant United States Attorney, Grand Rapids, MI, for United States of America, Internal Revenue Service.

Steven L. Williams, Esq., Grand Rapids, MI, for Deborah Fortier Vickers.

Larry VerMerris, Esq., Grand Rapids, Michigan, for James Hoerner, Chapter 7 Trustee.

*OPINION GRANTING UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE'S MOTION FOR RECONSIDERATION AND PARTIALLY GRANTING REQUEST TO MODIFY PREVIOUS COURT ORDER*

JAMES D. GREGG, Chief Judge.

### I. JURISDICTION

The court has jurisdiction over this bankruptcy case. 28 U.S.C. § 1334. The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D.Mich.). This matter is a core proceeding because it concerns the administration of the bankruptcy estate and the allowance or disallowance of claims against the estate. 28 U.S.C. § 157(b)(2)(A) and (B). This opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

### II. PROCEDURAL BACKGROUND

This matter is before the court pursuant to the United States of America, Internal Revenue Service's (hereinafter "IRS") Motion to Alter or Amend a previous order of this court (hereinafter the "Order").[1] The Order resulted from a consolidated hearing[2] on the IRS's objection to the priority claim filed by the Debtor's ex-spouse, Deborah Fortier Vickers (hereinafter "Vickers"), and Vickers' Motion for Distribution of Property of the Estate. The Order that the IRS seeks to modify: (1) allowed Vickers' priority claim for child support arrearages, despite the fact that it was tardily filed; (2) found that the IRS's tax lien claim against the Debtor was subordinate to Vickers' claim, in accordance with § 724(b) of the Bankruptcy Code;[3] and (3) directed the chapter 7 trustee to distribute $5,000 to Vickers as advance payment on her allowed priority claim. *See* FED. R. BANKR. P. 3009. The IRS's Motion to Amend was timely filed within ten days of the entry of the Order,[4] and the court hereby grants the IRS's request to reconsider its previous findings of fact and conclusions of law.

### III. FACTS

The parties stipulated to the facts during the June 25, 2003 hearing on this

---

1. The court's previous order was signed on July 3, 2003 and was entered on the court's docket on July 7, 2003. Dkt. No. 100.

2. The consolidated hearing occurred on June 25, 2003.

3. The Bankruptcy Code is contained in 11 U.S.C. §§ 101–1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ____."

4. The IRS's Motion to Amend was filed on July 17, 2003. Dkt. No. 103. *See* FED. R. BANKR. P. 9023(e).

matter. Although the court permitted the parties to present evidence during the hearing, each party declined to do so. Tr. at 31. Based upon the express consent of the parties' attorneys, the court relied upon the representations made by the attorneys for the IRS, the Trustee and Vickers, in lieu of actual testimony, as the uncontested and stipulated facts.

Scott James Fortier, herein referred to as the "Debtor," filed his petition for relief under chapter 7 of the Bankruptcy Code on September 14, 1999. Dkt. No. 1. The Debtor was the sole shareholder of an entity, Wolverine Litho, Inc., the "corporate debtor," that had previously filed for chapter 11 protection on April 17, 1998.[5] Pursuant to an Amended Judgment of Divorce entered by the State of Michigan, Kent County Circuit Court, in May 1997, the Debtor's child support obligations to Vickers were to be secured by both his personal *and* the corporate debtor's assets. Despite this fact, the Debtor failed to schedule Vickers as a creditor in either his individual bankruptcy case or in the corporate debtor's bankruptcy case.

Notwithstanding her lack of notice, after she discovered the bankruptcy cases, Vickers attempted to file a proof of claim for child support arrearages against the corporate debtor and/or the Debtor in October of 1999.[6] For reasons which still remain unknown, Vickers' proof of claim never appeared in the court's file.

Unaware of Vickers' potential priority child support claim against the Debtor, the chapter 7 trustee began to administer the Debtor's bankruptcy estate in late 1999. In large part, the trustee's administration focused on a piece of real property owned by the Debtor and located at 25 Carlton, N.E., in Grand Rapids, Michigan (hereinafter "the Carlton property"). The IRS held a tax lien against the Carlton property.[7] After lengthy negotiations, the trustee was able to arrange a settlement whereby the Carlton property was sold, the IRS's tax lien was subordinated to "administrative and other priority claims" against the Debtor's bankruptcy estate,[8] $5,000 was "carved-out" of the sale proceeds for the benefit of unsecured creditors, and the IRS was entitled to receive a $30,000 advance distribution on its claim. This agreement has been referred to in the pleadings, and will be referred to herein as the "Carve–Out Agreement." The Carve–Out Agreement was approved by this court on February 29, 2000. *See* Order Confirming Sale of 25 Carlton, N.E. Residence, for Tax Lien Subordination, Approval of "Carve–Out," and for Partial Disbursement of Proceeds, Dkt. No. 27. Notwithstanding that the deed to the Carlton property was in the Debtor's name, an issue existed as to whether the property was the corporate debtor's property. Even if the Carlton property was originally property of the corporate debtor, the IRS conceded that the Carlton property became property of the Debtor's bank-

---

5. The corporate debtor's case was converted to chapter 7 on February 22, 1999.

6. Until very recently, Vickers represented herself before this court.

7. The tax lien held by the IRS was against the corporate debtor. Tr. at 12. Although it was somewhat unclear at the hearing, the IRS apparently believed that the Carlton property was owned by the corporation and not by the

Debtor individually. *See* Declaration of Sue Ann Symons (Attached to the IRS's Motion to Amend), Dkt. No. 103.

8. The order approving the Carve–Out Agreement specifically acknowledges that the IRS's tax lien is "subject to subordination, under Bankruptcy Code § 724(b), to administrative and other priority claims identified therein." Dkt. No. 27.

ruptcy estate pursuant to the Carve–Out Agreement. Tr. at 12, 13 & 15.

After the court-approved sale of the Carlton property, the trustee issued a Notice of Possible Dividend to Creditors on March 15, 2000. Dkt. No. 33. The Notice established June 13, 2000 as the final day on which to file claims against the Debtor's bankruptcy estate. Because she was not listed on the Debtor's schedules, *Vickers received no notice.* On July 5, 2000, as contemplated by the Carve–Out Agreement, the trustee distributed $30,000 of the proceeds from the sale of the Carlton property to the IRS.

On July 17, 2001, well after the bar date established by the trustee's Notice of Possible Dividend, Vickers filed a second proof of claim against the Debtor's estate. Proof of Claim No. 33. Vickers, then representing herself, brought her claim to the court's attention by filing an objection to the Trustee's Report and Final Account on September 20, 2002. Dkt. No. 69. The court held a hearing to consider Vickers' claim on November 12, 2002. The IRS did not participate in this hearing. Thereafter, on November 14, 2002, the court entered an order allowing Vickers' late filed priority claim. Dkt. No. 76. Vickers' claim was allowed as of the date it was filed, July 17, 2001.

After the court allowed Vickers' tardy claim, the trustee filed a Motion for Turnover of Funds Previously Distributed to Internal Revenue Service, seeking to compel the IRS to return the $30,000 it had received pursuant to the Carve–Out Agreement.[9] Dkt. No. 77. The IRS countered by filing an Objection to the Allowance of the Claim of Deborah A. Vickers on February 24, 2003. Dkt. No. 84. Because the IRS had not been given an opportunity to participate in the November 12, 2002 hearing at which the court allowed Vickers' claim, the court set the IRS's objection for hearing. Upon conclusion of the second hearing which occurred on June 25, 2003, the court overruled the IRS's objection, again allowed Vickers' untimely filed priority claim, and subsequently entered the Order.[10]

Vickers responded to the IRS's Motion to Amend by filing a Motion for Turnover of All Available Estate Funds and for Costs on August 6, 2003. In her motion, Vickers requests that the IRS's Motion to Amend be denied, that the court determine that the $5,168.24 accrued interest on the Carlton property sale proceeds is property of the Debtor's bankruptcy estate, that the court set deadlines for identification of additional administrative expense claims and distribution of the amounts to which Vickers is entitled, and that the IRS be directed to pay various attorney's fees and expenses.

On September 8, 2003, Vickers filed a brief in support of her motion for turnover

---

9. The court granted the trustee's motion and entered an Interlocutory Order for Turnover of Funds from Internal Revenue Service to Trustee on February 28, 2003 (hereinafter "Interlocutory Order for Turnover"). Dkt. No. 86. As directed by the Interlocutory Order for Turnover, the IRS turned over the sum of $35,168.24 (representing the $30,000 sale proceeds plus interest) to be held pending the outcome of future court proceedings. However, the IRS mistakenly paid these funds to Elizabeth Chalmers, the chapter 7 trustee in the corporate debtor's case.

10. The Order directed Trustee Chalmers to "turnover any bankruptcy estate funds which she is holding, after subtracting any reasonable administrative expenses of her own," to James Hoerner, the chapter 7 trustee in the Debtor's case. The Order further provided that Trustee Hoerner would retain the sum of $5,168.24, i.e., the accrued interest on the sale proceeds, until further order of the court.

of all the estate funds. Dkt. No. 105. In this brief, she requests that interest be awarded and costs, including attorney fees, be granted.

On September 12, 2003, the IRS filed the United States' Response To Creditor Vickers' Motion For Turnover Of Funds And For Costs. The IRS asserts the Order resulted from a misconception of facts and, in any event, the imposition of interest and costs is unwarranted.

The court has carefully reviewed all papers submitted and has determined that the issues may be decided without further oral argument by the parties.

## IV. ISSUES

Was the Carlton property part of the Debtor's bankruptcy estate? Did this court properly allow Vickers' untimely filed priority claim for child support arrearages? Was the court correct in determining that the IRS's tax lien should be subordinated to Vickers' child support claim?

## V. DISCUSSION

### A. *Property of the Estate.*

The IRS's Motion to Amend is based, in large part, on the contention that the court mistakenly held that the Carlton property was property of the Debtor's estate. The IRS alleges that the property was titled in the name of the corporate debtor.

■ Section 541(a) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). During the June 25, 2003 consolidated hearing, the chapter 7 trustee's attorney represented to the court that the Carlton property was titled in the Debtor's name at the time his bankruptcy petition was filed. The IRS declined the court's invitation to present formal evidence on the issue and with the consent of all parties, the court accepted this representation as true and correct.[11] Because the Carlton property was titled in the Debtor's name as of the commencement of his bankruptcy case, the court properly determined that the Carlton property was property of the Debtor's bankruptcy estate under § 541(a)(1).

■ Even assuming that the IRS had presented some concrete factual evidence that title to the Carlton property was held by the corporate debtor as of the filing of the Debtor's bankruptcy petition, the IRS's argument would fail. Under § 541(a)(7), property of the estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case." At the conclusion of the June 25, 2003 hearing, the court determined that, notwithstanding potential discrepancies over which entity held the legal title to the Carlton property, the property was brought into the Debtor's bankruptcy estate pursuant to the Carve–Out Agreement. Indeed, the IRS conceded that the Carve–Out Agreement had such an effect

11. In its Motion to Amend, the IRS asserts that the chapter 7 trustee's attorney was mistaken when he represented to the court that the Carlton property was titled in the Debtor's name at the time the Debtor filed his bankruptcy petition. Instead, the IRS now claims that the Carlton property was held by the corporate debtor and was property of the corporate debtor's estate. The IRS's Motion to Amend, however, asserts no new factual evidence (e.g., the deed to the Carlton property). In the absence of such evidence, the court declines to alter its previous finding. Also, as discussed in this opinion, even if the property was the corporate debtor's property, the result would not be different. Per the state court judgment, Vickers had a claim against both the Debtor's estate and the corporate debtor's estate.

on at least three separate occasions during the hearing. Evidence that the corporate debtor held title to the Carlton property would not negate the court's holding that the Carlton property became property of the Debtor's estate as a result of the Carve–Out Agreement. Whether under § 541(a)(1) or (7), the Carlton property, and the proceeds from the sale thereof, is property of the Debtor's estate.

B. *Allowance of Vickers' Untimely Filed Claim.*

██ The court has already considered Vickers' untimely filed priority claim at two prior hearings. As a preliminary matter, the court notes that it is undisputed that Vickers' claim against the Debtor is for child support arrearages. If allowed, the claim is entitled to priority under § 507(a)(7).

The claims allowance analysis begins with § 502(b)(9), which provides that upon objection to a proof of claim, and after notice and a hearing, the court shall allow the claim, unless "proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure ...." Section 726(a) states, in pertinent part:

(a) Except as provided in section 510 of this title, property of the estate shall be distributed–

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title *or tardily filed before the date*

*on which the trustee commences distribution under this section ....*

(Emphasis added).[12]

The Sixth Circuit Court of Appeals has examined the treatment of late filed priority claims on two separate occasions. *See Internal Revenue Serv. v. Century Boat Co.*, 986 F.2d 154 (6th Cir.1993); *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087 (6th Cir.1990). Although both of these decisions were rendered prior to the amendment of § 726(a)(1) in 1994, and used slightly different reasoning than is now required, the basic analytical principles stated by the Sixth Circuit remain compelling.

The most recent of these cases, *Century Boat,* involved a priority claim for unpaid federal taxes that was filed by the IRS three years after the claims bar date and two years after it received actual notice of the debtor's bankruptcy. *Century Boat,* 986 F.2d at 155–56. Explaining that "the time of filing is less important than the priority status of a given claim," the Sixth Circuit held that the IRS's tardily filed claim was entitled to retain its priority status. *Id.* at 158. In so holding, the court reaffirmed the principle first articulated in *Cardinal Mine:* that "a priority creditor who fails to receive notice of the bankruptcy and consequently files an untimely proof of claim is not barred from receiving priority distribution as a matter of law." *Id.*

A majority of the other circuit courts of appeals that have decided the issue agree with the Sixth Circuit's interpretation of the pre-amendment version of § 726(a)(1). Those circuits have held that untimely filed priority claims shall be allowed under certain circumstances. *See Cooper v. In-*

---

**12.** Section 726(a)(1) was amended by the Bankruptcy Reform Act of 1994, Pub.L. 103–394. The amendment added the language "proof of which is timely filed under section 501 of this title or tardily filed before the date on which the trustee commences distribution under this section."

*ternal Revenue,* 167 F.3d 857 (4th Cir. 1999); *Internal Revenue Service v. Davis (In re Davis),* 81 F.3d 134 (11th Cir.1996); *United States v. Vecchio (In re Vecchio),* 20 F.3d 555 (2d Cir.1994); *United States v. Towers (In re Pacific Atlantic Trading Co.),* 33 F.3d 1064 (9th Cir.1994). *Contra United States v. Waindel (Matter of Waindel),* 65 F.3d 1307 (5th Cir.1995). The IRS benefitted from the holdings of these circuit decisions—in each case, the IRS's tardily filed proof of claim was allowed to retain its priority status.

In this contested matter, the IRS does not *directly* argue that these decisions should not apply to non-tax priority creditors. As explained by the Sixth Circuit Court of Appeals:

> [t]here are valid reasons for permitting *all tardily filed priority claims* to be paid whether or not the creditor had notice. Wages, contributions to employee benefit plans, claims of persons who have deposited grain in a grain elevator up to $2,000, rent or security deposits up to $900 are all claims which deserve very special consideration. Those considerations apply whether the claim is tardily filed or not .... *Since their priority is set in the statute, it is reasonable that that priority is more important than whether they were tardily filed either because they had received no notice of the bankruptcy or for some other reason.*

*Cardinal Mine,* 916 F.2d at 1091 (emphasis added).

The Sixth Circuit's reasoning in *Century Boat* and *Cardinal Mine* is buttressed by the 1994 amendments of § 726(a)(1). *See Cooper v. Internal Revenue,* 167 F.3d 857 (4th Cir.1999) (explaining that the amendment "essentially implement[s] the majority view" of the previous version of the statute). Amended § 726(a)(1) expressly contemplates the allowance of late filed priority claims, so long as such claims are filed before the trustee "commences distribution" of the debtor's bankruptcy estate.

■ Considering the $30,000 payment made to the IRS under the Carve–Out Agreement, one issue is whether Vickers' claim was filed before the trustee "commenced distribution" of the property of the Debtor's bankruptcy estate. The IRS contends that the advance payment it received pursuant to the Carve–Out Agreement precludes Vickers' later filed claim from satisfying the requirement that the untimely claim predates the time the Trustee "commences distribution."

Reported decisions interpreting the term "commences distribution" in the context of § 726(a)(1) have uniformly held that the trustee first commences distribution on the day the bankruptcy court *approves* the trustee's final report and account. *See Security State Bank v. Internal Revenue Service (Matter of Van Gerpen),* 267 F.3d 453 (5th Cir.2001); *Anderson v. Baer (In re Anderson),* 275 B.R. 922 (10th Cir. BAP 2002); *In re Wilson,* 190 B.R. 860 (Bankr.E.D.Mo.1996). These courts recognize that "distribution" has a special meaning in the bankruptcy context, "to the extent that it borders on being a term of art." *Matter of Van Gerpen,* 267 F.3d at 456. The trustee does not "commence distribution" by making administrative expense payments or other interim distributions of estate assets. *Id.* Instead, distribution of the chapter 7 bankruptcy estate is typically understood to occur "after the trustee has reduced the estate to cash by liquidating the debtor's nonexempt assets." *Id.* (quoting 6 COLLIER ON BANKRUPTCY ¶ 726.01 at 726–5 (15th ed.2000)).

From a practical perspective, this interpretation of "commences distribution"

makes particularly good sense.[13] Prior to the court's approval of the trustee's final report, the status of the bankruptcy estate can change—new assets might be found or new claimants might come forward. In fact, even after the final report is filed, parties in interest are given the opportunity to object to, and ultimately change, the proposed distribution. *See In re Anderson*, 275 B.R. at 927. "It is only after the Court resolves any objections to the Trustee's Final Report and signs the order approving the report that the proposed distribution becomes the approved distribution." *In re Wilson*, 190 B.R. at 862.

The IRS attempts to distinguish the present case from those cited above by relying upon the Carve–Out Agreement.[14] According to the IRS, when it received the $30,000 distribution under the court-approved Carve–Out agreement, these funds ceased to be property of the debtor's estate. Because, according to the IRS, the proceeds from the sale of the Carlton property had been distributed under the Carve–Out agreement and were no longer part of the debtor's estate when Vickers' tardy claim was filed, the IRS contends that she has no entitlement to the funds. This argument misconstrues the effect of the Carve–Out Agreement.

This court approved the Carve–Out Agreement so that the sale of the Carlton property could proceed. The Carve–Out Agreement also permitted the IRS to re-

---

**13.** In the context of tardily filed claims, this may be the only reasonable construction of the term, as "any other interpretation would result in the virtual evisceration of the statutory provision permitting tardy claims to be filed." *Matter of Van Gerpen*, 267 F.3d at 457. Under Federal Rule of Bankruptcy Procedure 2002(a)(6), the trustee need only provide notice before paying requests for compensation or reimbursement of expenses that exceed $1,000. "[I]t is not beyond peradventure, rather the opposite, that such minor expenses would arise and be paid shortly after the trustee assumes control of the bankrupt estate." *Id.* If the trustee "commenced distribution" upon payment of these minor expenses, such payments would effectively preclude the filing of tardy claims, even though lack of notice would result in few creditors, if any, knowing of that preclusion. *Id.* It is implausible that "Congress intended to consign the decision over whether and when tardy claims may be filed to such an elusive basis." *Id.*

**14.** The court notes that use of the term "Carve–Out Agreement" with reference to the settlement agreement that facilitated the sale of the Carlton property is misleading. Although the term is widely used but rarely defined, a "carve-out agreement" is generally understood to be "an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others, i.e., to carve out of its lien position." *See In re White Glove, Inc.*, No. 98–12493DWS, 1998 WL 731611, at *6 (Bankr.E.D.Pa. Oct.14, 1998). A true "carve-out" requires the consent of the secured creditor, as "[t]he Code ... establishes that a secured creditor's collateral may only be diminished to the extent that the secured creditor waives its right to the protections afforded by the Code, or to the extent that the expense priority directly confers a benefit on the secured creditor." *Harvis Trien & Beck, P.C. v. Federal Home Loan Mortgage Corp.*, 153 F.3d 61, 68 (2d Cir.1998). *See also* Richard I. Aaron, *"Carve–Out" As a Noun*, 7 J. BANKR. L & PRAC. 487, 487 (a "carve-out" occurs when fees for the debtor's attorney or other professionals are paid "by extracting them from the secured lender's *otherwise unassailable* collateral").

Unlike the typical secured creditor, however, the IRS's position in the property that is subject to its statutory tax lien is not indefeasible. To the contrary, § 724(b) specifically subordinates the IRS's tax lien to holders of valid priority claims. In this respect, the IRS's interest in the Debtor's property differs significantly from the type of lien or property interest involved in a true "carve-out" agreement. Although the proceeds were paid to the IRS, its tax lien on the proceeds was subject to subordination, i.e., the IRS collateral position was not "unassailable."

ceive an immediate distribution of $30,000 from the sale proceeds. This provision reflects the mandate in Federal Rule of Bankruptcy Procedure 3009, that "[i]n a chapter 7 case, dividends to creditors shall be paid as promptly as practicable."

The fact that, in this instance, an early distribution was made pursuant to a court-approved settlement agreement does not distinguish it from other interim distributions that may be made throughout the pendency of a chapter 7 case. For example, even when interim payments are made with court approval, § 726 requires disgorgement of such payments when necessary to facilitate the Code's overall distribution scheme. *See In re LTV Steel Co., Inc.,* 288 B.R. 775, 779 (Bankr.N.D.Ohio 2002) (recognizing that "claimants receiving interim payments could be 'required to disgorge' funds so that all administrative claims share pro-rata" as required under § 726(b)). *See also Specker Motor Sales Co. v. Eisen,* No. 2:03–CV–79, 2003 U.S. Dist. LEXIS 11865, at *5–6 (W.D. Mich. June 20, 2003) (interpreting § 726(b) as requiring debtor's counsel to disgorge a portion of his retainer to allow for *pro rata* distribution among all administrative claimants).

Acceptance of the IRS's reasoning would essentially thwart a main tenet of the Bankruptcy Code—that is, the principle of equality of distribution to similarly situated creditors. In the context of preferential transfers, for example, the United States Supreme Court has stated that:

> the preference provisions facilitate the prime bankruptcy goal of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter the 'race of diligence' of creditors to dismember the debtor before bankruptcy furthers [this goal].

*Union Bank v. Wolas,* 502 U.S. 151, 161, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991) (quoting H.R.Rep. No. 95–595 (1977), *reprinted in* 1978 U.S.C.A.A.N. 5963, 6137–38). Like the recipient of a preferential transfer, the IRS may not side-step the Bankruptcy Code's distribution scheme simply because, under the Carve–Out Agreement's early distribution provision, it "won the race" to the Debtor's assets. The IRS cannot improve its rights and defeat Vickers' ability to subordinate its lien claim, by entering into the so-called Carve Out Agreement in derogation of the Code's distribution provisions.

■ Finding no basis on which to distinguish this case from the well-reasoned decisions in *VanGerpen, Anderson,* and *Wilson,* this court holds that the trustee "commences distribution" for purposes of § 726(a)(1) on the date that the bankruptcy court approves the trustee's Final Report and Account. Because the trustee's Final Report and Account has not yet been approved in the present case, Vickers' claim was filed before the trustee "commenced distribution" of the Debtor's bankruptcy estate. Vickers' claim is allowed and is entitled to priority distribution pursuant to § 726(a)(1).

## C. *Subordination.*

■ The court's allowance of Vickers' tardily filed priority claim necessitates application of § 724(b). The order approving the Carve–Out Agreement specifically contemplates subordination of the IRS's tax lien to administrative and other priority claims identified in § 724(b). Indeed in instances of this type, the Code requires that the IRS tax lien be subordinated to Vickers' priority claim for child support.

The Bankruptcy Code states:

Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed–

(1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

(2) second, to any holder of a claim of a kind specified in section 507(a)(1), 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;

(3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection

. . . .

11 U.S.C. § 724(b).

In practicality, § 724(b) subordinates payment of statutory tax liens to the payment of all priority claims under § 507(a)(1) through (7), while leaving the claims of senior and junior consensual lienholders undisturbed. *See United States v. Darnell (In re Darnell)*, 834 F.2d 1263, 1266–67 (6th Cir.1987) (quoting H.R. Rep. No. 95–595 (1977), *reprinted in* 1978 U.S.C.A.A.N. 5963, 6338); *In re Oglesby*, 196 B.R. 938, 942 (Bankr.E.D.Va.1996).

The Sixth Circuit Court of Appeals discussed the operation of § 724(b) in *Morgan v. K.C. Machine & Tool Co. (In re K.C. Machine & Tool Co.)*, 816 F.2d 238 (6th Cir.1987). The issue in *K.C. Machine* arose when, following conversion of the debtor's case from chapter 11 to chapter 7, the chapter 7 trustee sought bankruptcy

court approval of a proposed sale the debtor's assets free and clear of liens under § 363(f). The City of Detroit, along with other local taxing authorities, held a tax lien on the debtor's property and opposed the sale, asking instead that the bankruptcy court compel the trustee to abandon the property under § 554(b). If the City of Detroit prevailed, and the property were abandoned, the City would stand in a position of priority ahead of all non-tax creditors, except for the secured lender. If, however, the sale were approved, distribution of the sale proceeds would be governed by § 724(b) and the City's tax lien would be subordinated to the administrative priority claims of the chapter 11 creditors.

Finding that the subordination of the City's tax lien to the chapter 11 administrative expenses under § 724(b) would provide a benefit to the debtor's estate, the Sixth Circuit held that court-ordered abandonment of the property was not appropriate. *K.C. Machine*, 816 F.2d at 243. The court explained that Congress, in enacting § 724(b), "chose to subordinate tax liens, which normally have priority by law, to the § 507(a) administrative expenses involved herein." *Id.* at 244. Although the court acknowledged that administrative expenses are not typically charged against secured creditors,[15] it noted that "this situation has been expressly changed by the Code, which subordinates the tax lien to the administrative creditors, in effect charging the administrative expense against the secured tax creditor." *Id.* at 247.

The Sixth Circuit's reasoning applies with equal force to Vickers' § 507(a)(7) priority claim which, like the administrative expenses addressed in *K.C. Machine,*

---

**15.** At least, not without the secured creditor's consent. *See* discussion of "carve-out" agreements, *supra* note 14.

is to be paid before the IRS's tax lien claim under the distribution scheme set forth in § 724(b). The fact that the IRS must disgorge the $30,000 advance payment it received under the Carve–Out Agreement to facilitate the proper outcome does not alter § 724(b)'s express distribution requirements. *See, e.g., In re Oglesby,* 196 B.R. at 944 ("There is no question that the court can require a party to disgorge payments received from a bankruptcy estate which in hindsight were made in contravention of the order of distribution required by the Bankruptcy Code.").

### D. *The Dispute Over Interest and Attorney's Fees.*

In an interlocutory order, dated February 28, 2003, the IRS was ordered to turn over $30,000 to the estate. In what appears to be an error, the IRS returned $35,168.24 to the estate.[16] Apparently, the excess $5,168.24 constituted interest on the $30,000 previously distributed to the IRS. Whether the estate or the IRS should receive the excess payment remained an issue in this court's prior order.

Neither party previously directly addressed this issue. No authorities have been cited by Vickers to assist the court in deciding the issue.[17]

■ The IRS was paid $30,000 pursuant to the Carve–Out Agreement which was approved by the court. Until such time that disgorgement was ordered, the money belonged to the IRS. After disgorgement was ordered, the money (plus the erroneous extra amount) was promptly returned. Under such circumstances, accrual of the interest appears to be inappropriate.[18] Therefore, the excess $5,168.24 shall be returned by the trustee to the IRS as soon as is practicable.

■ Vickers, in her August 6, 2003 motion, and reiterated in her brief filed on September 8, 2003, asks that the court assess attorney's fees against the IRS. The request is for $2,000 for her attorney and $2,000 for the trustee's attorney. To support her request, Vickers has attached an affidavit stating she has four children, now aged 21, 18, 15 and 12, and that the delay in obtaining payment has caused financial and emotional distress to the children and her for the past eight years.

Although the undersigned judge is sympathetic to Vickers' circumstances, her request for attorneys' fees is denied. Although the IRS seems to be playing "hard ball" against an unfortunate citizen, no statute or rule has been cited, or is now known to the court, that would justify an award of attorney's fees under the existing facts. As to the trustee's attorney, if additional fees are requested, a supplemental fee application may be submitted. If an objection is lodged to any such fee request, a hearing will be held.

### E. *Summary.*

Based upon the above discussion, the court's prior order dated July 3, 2003, and

---

**16.** The funds first were transmitted to Elizabeth Chalmers, Trustee of the Wolverine Litho corporate estate. Per later court order, the funds were to have been transferred to James Hoerner, Trustee of the Debtor's estate. Because no party has raised an issue, the court believes that Trustee Hoerner now holds the returned funds.

**17.** However, on September 12, 2003, just before the court released this opinion, the IRS

filed the United States' Response To Creditor Vickers' Motion For Turnover Of Funds And For Costs. The court agrees with the IRS's assertion that the excess $5,168.24 was erroneously remitted to the estate.

**18.** If the IRS, or for that matter any entity, refused to promptly disgorge funds, interest to compensate the estate for the delayed turnover might then be appropriate.

entered on July 7, 2003, is reiterated, except as modified in certain respects, as follows:

1. Vickers' priority Proof of Claim filed for child support arrearages is allowed notwithstanding that it was tardily filed.

2. The amount of Vickers' claim, as set forth by her amended Proof of Claim filed on August 6, 2003, is $41,214.36.[19]

3. Of the $35,168.24 returned by the IRS, the estate will retain $30,000 to be distributed to creditors, with the balance returned to the IRS by the chapter 7 trustee as soon as is practicable.

4. The IRS tax lien is subordinate to Vickers' allowed priority claim for unpaid child support. The trustee will calculate the amount of such subordination as soon as is practicable after Vickers' claim amount is determined with specificity, either by the filing of another amended claim, the filing of a stipulation signed by Vickers, the trustee and the IRS, or as may be determined by the court after notice and hearing.

5. To the extent the trustee's attorney is entitled to additional attorney's fees, a supplemental fee application shall be filed as soon as is practicable, but in no event later than the submission of the trustee's revised Final Report and Account.

6. Unless a timely appeal of the order that will be entered in accordance with this opinion is filed by the IRS, the trustee shall pay Vickers the sum of $5,000 as an advance payment of her allowed priority claim to partially alleviate the financial hardship of the children and her. FED. R. BANKR. P. 3009.

7. Immediately after the later of (1) the expiration of the appeal period relating to the order entered in accordance with this opinion, or (2) upon the entry of an order which determines the amount of Vickers' allowed child support claim with specificity, the trustee shall file his amended Final Report and Account.

A separate order shall be entered accordingly.

## VI. CONCLUSION

In the reported decisions rendered by the various Courts of Appeals, the IRS has prevailed in its arguments that it is entitled to allowance of untimely filed priority claims. Now that a higher priority creditor makes the same argument, the IRS strongly protests. If a moral issue was involved in this case, the court would find the IRS to be hypocritical. However, because a legal issue is involved, the IRS appears to be merely disingenuous. The court apologizes to Vickers for the delay she has encountered in establishing her entitlement to an allowed priority claim. Regretfully, obtaining justice sometimes takes time.

---

**19.** Vickers has claimed child support arrearages from August 16, 1993 to the *present*. She is only entitled to a claim for child support arrearages until the date of the filing of the chapter 7 case, i.e., September 14, 1999. Rather than encountering additional delay, the court encourages Vickers to file another amended claim with the proper calculation. If this is not done, the court expects another objection to the amount of her claim will be filed.